UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
DARIO ORMEJUSTE,

                   Petitioner,        <u>MEMORANDUM AND ORDER</u>

    -v-                        15-CV-5567 (JS)

DALE ARTUS, Superintendent of Attica-
Correctional Facility,

                   Respondent.
------------------------------------X
APPEARANCES

For Petitioner:     Dario Ormejuste, <u>pro se</u>
                    12-A-3641
                    Attica Correctional Facility
                    639 Exchange Street
                    Attica, New York  14011

For Respondent:    Andrea M. DiGregorio, Esq.
                    Nassau County District Attorney's Office
                    252 Old Country Road
                    Mineola, New York  11501

SEYBERT, District Judge:

        Pending before the Court is a <u>pro se</u> petition, submitted by Dario Ormejuste ("Petitioner" or "Ormejuste"), for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("§ 2254") raising four grounds for relief.  (Petition ("Pet."), ECF No. 1.)  Respondent Dale Artus, named in his capacity as the Superintendent at the Attica Correctional Facility (the "State" or "Respondent"), has responded to the Petition.  (<u>See</u> Respondent's Response in Opposition ("Resp. Opp."), ECF No. 8 at 1-71.)  For the reasons set forth below, the petition is denied, and the case dismissed.

BACKGROUND

I.    The Offense Conduct[1]

Petitioner lived at a house located at 117-40 238th Street, Elmont, New York (the "Residence"), that he shared with his parents, Bob Ormejuste ("Bob"), and Rose Ormejuste ("Rose"), and his brother, Guerby Ormejuste ("Guerby"). (Tr. 322:22-24.)  In June 2010, Guerby was thirty years old and employed as a New York City Corrections Officer, (Tr. 323:15; 327:5-6); Petitioner was twenty-four and unemployed.  (Tr. 323:17; 336:9.)

Tex Ormejuste ("Tex"), Bob's brother, testified that he lived on the same block as the Residence and saw Bob almost every day.  (Tr. 322:17-18; 325:23-326:8.)  The last time Tex saw Bob was on Sunday, June 20, 2010. (Tr. 337:14-17.)  On Monday, June 21, and Tuesday, June 22, 2010, Tex did not see Bob; he went to Bob's house at about 6:00 p.m. both nights and rang the bell, but no one answered.  (Tr. 339:6-340:25.)

At approximately 3:30 a.m. on Wednesday, June 23, 2010, Tex received a phone call from Guerby's supervisor saying that Guerby had not shown up for work for two days and asking Tex to

---

[1]  The summary of facts is drawn from: the trial transcript ("Tr.") (see ECF Nos. 5-7); the Petition; Petitioner's state court appellate brief (the "Appellate Brief" or "App. Brief") (see Pet. Ex. A, ECF No. 1-1), which Petitioner incorporates by reference into his Petition in support of his claims (see Pet., ¶¶14-15, 17-18); and Respondent's Response in Opposition (see ECF No. 8).

check on him.[2] (Tr. 343:3-12; 672-73.) Tex promptly went to the Residence and heard loud music, which stopped playing after Tex rang the doorbell. (Tr. 343:15-344:19.) He called the house phone and, after no one answered, he called the police. (Tr. 344:23-345:2; 345:8.)

The police arrived at the Residence, responding to a "well check" — a request to check up on the family and make sure everyone is alright. (Tr. 383:4-14; 418:8-419:1.) Upon their arrival, the police officers and Tex made numerous unsuccessful efforts to elicit a response from within the Residence for an approximate ten-minute period, e.g., walking around the house, knocking on the windows, calling out, ringing the doorbell, knocking on the door, and making phone calls, but all with no answer. (Tr. 345:23-346:23; 386:12-20.) They observed a light on at the back of the Residence. (Tr. 403:11-20.) The police also checked the doors and windows to see if there was any damage, but found none, nor any signs of a potential break-in. (Tr. 385:8-12; 387:17-21.)

The responding officers called for a supervisor; thereafter, Sergeant Timothy Rooney arrived. (Tr. 388:7-14.) Sergeant Rooney had them repeat efforts to contact someone in the house, including knocking on doors and windows, calling out, and

---

[2] Tex was listed as Guerby's "next of kin" in information maintained by Guerby's employer. (See ECF No. 8-1 at 74.)

trying all phone numbers. (Tr. 389:2-23.) Although phones could be heard ringing inside, no one answered or responded to any of the actions taken. (Tr. 389:17; 419:21-25; 423:7-21.) After about fifteen minutes, Sergeant Rooney made the decision to enter the home to see if anyone was injured. (Tr. 390:9-14; 423:21-424:1.) The officers removed an air conditioner unit from a back window and Officer Averill Thompson entered the house. (Tr. 391:1-11.) Finding himself in a bedroom with a locked door, Officer Thompson pried open the door, whereupon he detected the smell of bleach. (Tr. 392:3-393:12; 395:5-10.) Then, hearing movement upstairs, Officer Thompson drew his weapon and moved from the bedroom into the house, calling out "Police" loudly multiple times, but getting no response. (Tr. 396:1-397:2.) He opened a side door to admit his partner and Sergeant Rooney. (Tr. 397:15-16.) Noticing a couch-like object in the kitchen, the officers approached, pulled back a sheet, and discovered the dead body of a black male with dried blood on him. (Tr. 398:18-399:9; 427:13-15.)

Given this discovery and the sound of movement in the upstairs, the officers left the house to call for additional officers. (Tr. 399:12-15; 428:8-11; 442:22-24.) Sergeant Rooney called for assistance and a perimeter was established around the house. (Tr. 428:2-11.) Officers from the Emergency Services Unit ("ESU") arrived on the scene. (Tr. 401:1-6.)

At approximately 6:45 a.m., movement was detected in an upstairs window; then the front door opened, and Petitioner appeared. (Tr. 431:1-6; 447:1-11; 452:6-8.) As Petitioner exited the house, ESU officers advanced while issuing orders for him to show his hands and get on the ground. (Tr. 447:19-448:8.) Officers were able to get him on the ground, but Petitioner would not follow verbal commands and refused to be handcuffed. (Tr. 449:6-13.) An officer used a taser on Petitioner, after which officers successfully subdued and handcuffed him. (Tr. 449:14-16.) Petitioner was placed under arrest and put in the rear of a marked Nassau County Police Department car. (Tr. 496:16-21.)

A tactical squad from the Bureau of Special Operations ("BSO") entered the Residence and went room to room looking for other people. Some officers went upstairs, where they found no one, but observed a Glock, a black semi-automatic weapon, on a small table. (Tr. 471:18-22.) The Glock was later determined to have been owned by Guerby in his capacity as a corrections officer at Rikers Island. (Tr. 599-600; 649-50.)

Returning downstairs, the BSO officers saw the body of an older man taped or tied up on the kitchen floor, saw blood, and smelled bleach. (Tr. 473:24-474:2.) This individual was ultimately identified as Bob Ormejuste, Petitioner's father (Tr. 743:19-22), who suffered two gunshot wounds to the neck and left eye, the latter of which perforated his brain. (Tr. 940:1-4;

944:17-945:4.)  The medical examiner testified that Bob had been dead for two to three days by the time the autopsy was performed on June 24, 2010.  (Tr. 948:21-25.)

After discovering no one else on the main floor, the BSO officers proceeded into the basement, where they observed blood on the floor and discovered another covered body.  (Tr. 474:25-475:1-5.)  This individual was later identified as Guerby Ormejuste, Petitioner's brother.  The medical examiner determined that Guerby had ten gunshot wounds, one each to his arm, abdomen, groin, face, and six to his back (Tr. 883:7-10), and that at the time of the autopsy, on June 24, 2010, he had been dead for two days, plus or minus six hours.  (Tr. 902:23-25.)  After clearing the house and confirming that no other individuals were present within, the BSO officers withdrew.

Officers from the Crime Scene Search Unit subsequently processed the scene, taking photographs and collecting evidence, including, inter alia: (1) the Glock observed by the BSO officers and ammunition (Tr. 773:16-774:2); (2) drops of blood on the side door and driveway that matched a DNA profile for Rose (Tr. 759:18-21; 1099:6-9); (3) a pair of Timberland boots that had DNA on the inside matching a sample from Petitioner's saliva, and blood on the bottom that matched a DNA profile for Guerby (Tr. 752:15-23; 1089:7-9; 1088:19-23; 1090:15-18); (4) bullets in the kitchen wall and in the basement that were later found to be consistent with

6

having been fired by the Glock[3] (Tr. 794:21-23; 765:10-12); (5) bottles of bleach (Tr. 766:10-16); and, (6) latex gloves in the downstairs hallway and the upstairs bathroom (Tr. 745:18-19; 773:16-774:2).

After being taken into custody, Petitioner was taken to the Fifth Precinct in Elmont. (Tr. 497:13-16.) Upon arrival at approximately 8:00 a.m., Petitioner was brought to an interview room and his handcuffs were removed. (Tr. 497:17-498:5.) Detectives Carl Re and Roberto DePietro proceeded to take pedigree information from Petitioner, including that he lived in the upstairs of the Residence, that his parents lived on the main floor, and that Guerby lived in a basement apartment. (Tr. 500:9-501:22.) After eliciting the background information and providing him with some food, Detective Re read Petitioner his Miranda rights off a card. (Tr. 503:7-504:2.) Petitioner indicated, verbally and in writing, that he understood the rights and answered "Yes" when asked if he would be willing to answer questions. (Tr. 504:8-505:6.)

According to the detectives, Petitioner claimed not to have seen any family member since Sunday. (Tr. 513:4-8.) He

---

[3] In addition, autopsies recovered five bullets from Guerby's body, and a bullet and bullet fragment from Bob's body, all of which were also determined to be consistent with having been fired from the Glock. (Tr. 1025:15-23; 1029:20-1030:1.)

claimed to have been sticking to his daily "ritual" on both Monday and Tuesday, which consisted of arising at 6:40 a.m., showering, eating peanut butter cups or pieces for breakfast, having a cigarette, then leaving the Residence around 9:00 a.m. to spend the entire day at a local park. (Tr. 509:18-510:4; 512:21-513:25; 514:16-515:4.)

Petitioner did not react when told that his father and brother were dead or that his mother was missing, but just sat there. (Tr. 519:15-520:6.) He then told the detectives that "Lugaroo," did it, describing Lugaroo as a Haitian vigilante group that sells crack and cuts people's heads off. (Tr. 520:11-19.) At one point he indicated that his mother, father, and Tex all smoked crack, and that all three were Lugaroo. (Tr. 521:8-16.) He suggested that his mother might by at an aunt's house, but acknowledged that she could be dead. (Tr. 522:15-523:8.)

At approximately 11:40 a.m., Petitioner was transferred to the Homicide Squad at Police Headquarters in Mineola. (Tr. 537:18-538:7.) He was interviewed again by Detective Re and the lead detective on the case, Mark Garry. (Tr. 582:3.) This interview started at about 12:20 p.m., concluded before 4:00 pm., and was recorded by audio and video. (Tr. 583:13-18.) Petitioner was not re-read his Miranda rights prior to questioning at Police Headquarters.

The whereabouts of Petitioner's mother, Rose, was unknown on June 23, 2010. Paule Ormejuste, Tex's wife and Rose's sister-in-law, testified that :she last spoke to Rose from 10:00 to 10:45 a.m. on Monday June 21, 2010; Rose was scheduled to work a shift starting at 3:00 p.m.; and, Rose would leave at about 1:30 p.m. to travel to work using public transportation. (Tr. 664:19-666:25.) Rose did not show up for work on that Monday, or on Tuesday, June 22, 2010. (Tr. 701:7-18.) A neighbor saw Petitioner driving Guerby's car, a Lexus, at approximately 3:00 pm. on Monday, June 21, 2010, and then parking it in the driveway. (Tr. 868:18-869:11.) On or about June 23, 2010, after the discovery of the other bodies, the Missing Person's Squad was notified that Rose was missing; thereafter, it put out a notice about Rose including information about Guerby's car. (Tr. 593:13-25.) On July 6, 2010 and responding to a complaint of a foul odor, officers discovered the Lexus in Brooklyn on Avenue J. (Tr. 659:21-24; 974:18-975:6.) When ESU officers opened the trunk, they found Rose's decaying body. (Tr. 978-79.) The medical examiner found two gunshot defects – an entrance and exit wound – on Rose's head (Tr. 1003:4-20); she determined that the condition of the body was consistent with death having occurred on or about June 21, 2010. (Tr. 1007:2-6.)

II.  The Suppression Hearing and Trial

On July 28, 2010, and pursuant to Nassau County
Indictment Number 1685N/10, Petitioner was charged with: one count
of murder in the first degree (N.Y. PENAL LAW § 125.27[1][a][viii]);
three counts of murder in the second degree (N.Y. PENAL LAW §
125.25[1]); and, one count of criminal possession of a weapon in
the second degree (N.Y. PENAL LAW § 265.03[1][b]).

In May 2012, upon Petitioner's omnibus motion, a
combined Mapp/Dunaway/Huntley[4] hearing was held (hereafter, the
"Suppression Hearing").  "The Huntley hearing pertained to various
oral statements and videotaped statements allegedly made by
[Petitioner].  The Mapp hearing pertained to clothing allegedly
seized from [Petitioner].  The Dunaway hearing pertained to
probable cause for the arrest of [Petitioner]."  People v.
Ormejuste, 35 Misc.2d 1235(A), 953 N.Y.S.2d 552 (N.Y. Sup. Ct.,
Nassau Cnty. 2012) (the "Suppression Decision").  The People
presented five witnesses: four police officers and one detective;
"[t]he defendant did not call any witnesses."  Id.  Finding the
testimony of the People's witnesses to be credible, and considering
the totality of the evidence presented, the state court found,
inter alia: (1) that the police had a valid, emergency basis for
the initial entry into the Residence as they were motivated by

_____

[4]  See Mapp v. Ohio, 367 U.S. 643 (1961); People v. Dunaway, 442
U.S. 200 (1979); and, People v. Huntley, 15 N.Y.2d 72 (1965).

concerns about the well-being of the occupants and not by an intent to arrest anyone or to seize evidence; (2) that there was probable cause to arrest Petitioner; (3) that since there was probable cause for the arrest, the search of Petitioner was legally permissible as a search incident to a lawful arrest; and (4) none of the challenged statements would be suppressed because (a) Petitioner's statement made to the arresting officer at the scene was spontaneous and voluntary; (b) Petitioner, after receiving his Miranda warnings, voluntarily waived his right to remain silent and answered Detective Re's questions at the Fifth Precinct; and, (c) it was unnecessary to repeat the Miranda warnings prior to the subsequent, videotaped questioning of Petitioner at Police Headquarters where the additional questioning commenced within a reasonable time after a break in the initial questioning and where he had received his Miranda warning a short period prior to said questioning. See id.

After a jury trial, Petitioner was found guilty of all counts, and judgment was rendered against him on July 25, 2012. He was sentenced to the following concurrent terms of imprisonment: life without parole for his first-degree murder conviction; twenty-five (25) years to life for each of the three second-degree murder convictions; and fifteen (15) years for his weapon-possession conviction. An additional five-year, post-release supervision condition was also imposed.

III. The Post-Conviction Proceedings

        On direct appeal, which included Petitioner's appeal of
the Suppression Decision, Petitioner's counseled brief raised the
following four claims:  (1) the police's warrantless entry into
Ormejuste's Residence was illegal, and the evidence seized therein
should have been suppressed, and a new trial should be ordered
(the "Entry Claim") (App. Br. 15-23); (2) Ormejuste's rights to
due process and a fair trial were denied when the prosecutor,
during summation, appealed to the jurors' emotions and disparaged
the defense (the "Summation Claim"), (id. at 23-26); (3) the trial
court erred in allowing a hearsay reference to a room as
Ormejuste's bedroom, resulting in a denial of his rights to due
process and a fair trial (the "Hearsay Claim") (id. at 26-31); and
(4) all of Ormejuste's statements should have been suppressed (the
"Statements Claim") (id. at 31-39).

        The Appellate Division upheld Petitioner's judgment of
conviction.  See People v. Ormejuste, 117 A.D.3d 756, 985 N.Y.S.2d
139 (N.Y. App. Div., 2d Dep't 2014).  As to Petitioner's Entry
Claim, the Appellate Division held, "[c]ontrary to [Ormejuste]'s
contention, the evidence presented at the suppression hearing
demonstrated that the initial warrantless entry into his home by
the police fell within the emergency doctrine exception to the
warrant requirement;" thus, "the County Court properly denied that
branch of [Ormejuste]'s omnibus motion which was to suppress the

physical evidence obtained from his home." Id. (citations omitted). It further held that the balance of Ormejuste's claims were unpreserved, see id. (citing N.Y. CRIM. PROC. LAW § 470.05[2]; further citations omitted), adding that, as to the Summation Claim, "the contested remarks were responsive to arguments and theories presented in the defense's summation, were permissible rhetorical comment, or constituted harmless error," id. (citations omitted), and as to the Statements and Hearsay Claims, they were without merit, see id. (citations omitted).

On May 16, 2014 and through counsel, Petitioner wrote to the Clerk of the Court of the New York Court of Appeals requesting leave to appeal. (See May 16, 2014 Appellant Letter, Ex. 3, ECF No. 8-1 at 118, attached to Resp. Opp.) This letter attached the appellate brief, the respondent's brief, and the Appellate Division decision. By letter dated May 30, 2014 and addressed to the Honorable Susan Phillip Read of the Court of Appeals, counsel purported to supplement the Appellate Brief, arguing that the police did not have an emergency basis upon which to enter Petitioner's Residence and that "leave should be granted . . . to rectify the illegal procedures utilized by the police and for purposes of guiding the lower courts in their determination of searches based on claims of 'wellness check' and/or the emergency doctrine." (See May 30, 2014 Appellant Letter, Ex. 3, ECF No. 8-1 at 119-122, attached to Resp. Opp.) No further arguments were

advanced.    The People opposed the application, asserting that review was unwarranted as "[a] lower court's determination that exigent circumstances existed to justify a warrantless entry into a home involves a mixed question of law and fact, and is beyond the scope of the [Court of Appeal]'s review when supported by the record."  (June 25, 2014 Resp. Letter, Ex. 4, ECF No. 8-1 at 124-127, attached to Resp. Opp.)  The application for leave to appeal was summarily denied.  See People v. Ormejuste, 24 N.Y.3d 963, 20 N.E.3d 1002, 996 N.Y.S.2d 222 (Table) (2014).  Ormejuste did not seek further review by the Supreme Court, nor did he file any post-judgment state motions challenging his conviction.  (See Affidavit of Andrea M. DiGregorio ("Resp. Aff."), ECF No. 8 at 4-13, ¶¶25-26.)  Instead, he filed this timely Petition.

IV.  The Instant Petition

By Petition dated September 8, 2015,[5] Petitioner seeks a writ of habeas corpus pursuant to § 2254.  He challenges his state court conviction raising the identical four grounds he asserted in his state court appeal, i.e.: (a) that the warrantless entry into the Ormejuste Residence was illegal and, therefore, the evidence seized therein should be suppressed and a new trial ordered (citing, inter alia, the Fourth Amendment) (i.e., the Entry

_____

[5]    The Petition was received in the Court's Pro Se Office on September 14, 2015.  (See Petition at 1 (stamped with receipt date of "SEP 14 2015").)

14

Claim); (b) the denial of Petitioner's due process rights and a fair trial because summation comments by the prosecutor appealed to the jurors' emotions (citing, _inter alia_, the Fourteenth Amendment) (_i.e._, the Summation Claim); (c) the erroneous introduction of hearsay evidence which undermined Petitioner's defense, thereby depriving him of due process and a fair trial (_i.e._, the Hearsay Claim); and (d) the trial court erred in its refusal to suppress Petitioner's: (i) post-_Miranda_ confession, which were part of a single custodial police interrogation that began before the warnings were administered, and (ii) initial statements to the police before _Miranda_ warnings were administered (_i.e._, the Statements Claim).

In compliance with the Court's October 1, 2015 Order to Show Cause ("OSC") (_see_ ECF No. 3), the Nassau County District Attorney's Office submitted opposition on behalf of Respondent asserting, _inter alia_, that Petitioner "raises all the claims that he presented in his Appellate Division brief" that he raised on direct appeal and in his leave application to the New York State Court of Appeals, and which claims were denied. (_See_ Resp. Aff. ¶27; _see also id_. at ¶¶20, 22, 23, 25; Resp. Opp.) In addition to the affidavit and memorandum of law, Respondent submitted both parties' appellate briefs, the letters to the Court of Appeals regarding Ormejuste's request for leave to appeal the Appellate

Division's decision, and the transcripts of the Suppression Hearing and trial.

Respondent opposes all of Petitioner's grounds for granting habeas relief, asserting: (a) that Petitioner's Fourth Amendment claim, the Entry Claim, is barred pursuant to Stone v. Powell, 428 U.S. 465 (1976), as "New York provides approved mechanisms by which a defendant can raise his Fourth Amendment claims, [so that P]etitioner cannot rightly claim the state provided no corrective procedures to redress the alleged Fourth Amendment violations" (Resp. Opp. at 30); (b) that because "Petitioner did not fairly present his remaining claims [(hereafter, the "Remaining Claims")[6]] to the Court of Appeals – the highest state court empowered to review the claims – he is barred from doing so now" as this was "an inexcusable procedural default in state court that prevents him from being granted habeas corpus relief as to those claims" (id. at 38); (c) that the Remaining Claims "are also procedurally barred from federal habeas corpus review by an independent and adequate state procedural ground," i.e., Petitioner's failure to preserve his arguments for appellate review (id. at 45; see also id. at 46-47); and (d) even if Petitioner did not face two procedural bars regarding the Remaining Claims, as to those claims, the Appellate Court

---

[6] For clarity, the term "Remaining Claims" refers collectively to Petitioner's Summation Claim, Hearsay Claim, and Statements Claim.

alternatively found them to be without merit, which findings are not contrary to, or an unreasonable application of, clearly established federal law.  (See id. at Points IV (addressing the Summary Claim), V (addressing the Hearsay Claim), and VI (addressing the Statements Claim).)

Petitioner did not reply to the Respondent's Opposition and has not otherwise supplemented his filings despite being offered the opportunity to do so.  (See Case Docket, in toto; see also OSC, ¶4 (providing Petitioner the opportunity to file a reply to Respondent's response), and corresponding docket text (noting service of OSC upon Petitioner).)

LEGAL STANDARDS

I.   § 2254 Standard of Review

"It is well established that a federal habeas court does not sit to correct a misapplication of state law, unless such misapplication violates the Constitution, laws, or treaties of the United States."  Ponnapula v. Spitzer, 297 F.3d 172, 182 (2d Cir. 2002).  Pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas court considering a claim that was decided on the merits in a state court proceeding may grant relief only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or" (2) "based on an

17

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The AEDPA establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 411 (2000); see also McBride v. Perez, No. 13-CV-4792, 2015 WL 5245072, at *8 (S.D.N.Y. June 25, 2015) ("'[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States.'" (quoting Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)). The requirements set forth by the AEDPA are strictly construed and by design erect a barrier to federal habeas relief founded upon the principle that "[s]tate courts are adequate forums for the vindication of federal rights" and are "presumptively competent[] to adjudicate claims arising under the laws of the United States." Burt v. Titlow, 571 U.S. 12, 19 (2013) (internal quotation marks and citation omitted).

Under § 2254(d)(1), a state court decision is considered "contrary to" federal law if it either "applies a rule that contradicts the governing law set forth in [the Supreme Court's]

cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." Williams, 529 U.S. at 405-06. "'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" Green v. Travis, 414 F.3d 288, 296 (2d Cir. 2005) (alteration in original) (quoting Williams, 529 U.S. at 412). An "unreasonable application" of federal law occurs where the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Williams, 529 U.S. at 407-08. "The critical point is that relief is available under § 2254(d)(1)'s unreasonable application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question." White v. Woodall, 572 U.S. 415, 427 (2014) (internal quotation marks and citations omitted).

Regarding the second subsection of § 2254(d), courts have had "fewer opportunities to consider what constitutes an 'unreasonable determination of the facts'" pursuant to § 2254(d)(2), compared with § 2254(d)(1). Cardoza v. Rock, 731 F.3d 169, 177 n.5 (2d Cir. 2013). The state court's determination of the facts "is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first

19

instance." Wood v. Allen, 558 U.S. 290, 301 (2010).  A finding
may rise to the level of an unreasonable determination of the facts
"where, for example, reasonable minds could not disagree that the
trial court misapprehended or misstated material aspects of the
record in making its finding, see Wiggins v. Smith, 539 U.S. 510,
528, 123 S. Ct. 2527, 156 L. Ed.2d 471 (2003), or where the court
ignored highly probative and material evidence, see Miller-El v.
Cockrell, 537 U.S. 322, 346, 123 S. Ct. 1029, 154 L. Ed.2d 931
(2003)."  Cardoza, 731 F.3d at 177-78.  However, "even if the
standard set forth in section 2254(d)(2) is met, the petitioner
still 'bears the ultimate burden of proving by a preponderance of
the evidence that his constitutional rights have been violated.'"
Id. at 178 (quoting Epps v. Poole, 687 F.3d 46, 50 (2d Cir. 2012));
cf. Nowakowski v. New York, No. 13-CV-3709, 2018 WL 6421056, at *6
(E.D.N.Y. Dec. 6, 2018) ("[F]or claims of 'unreasonable
determination[s] of the facts' under paragraph (d)(2), an
applicant bears the additional burden of 'rebutting the state
court's factual findings 'by clear and convincing evidence.'"
(quoting Burt, 571 U.S. at 20) (alteration in original)).

II.  Procedural Bars to Federal Habeas Review

    A.  Failure to Exhaust

        A habeas petition will not be reviewed by the district
court unless "the applicant has exhausted the remedies available
in the courts of the State."   28 U.S.C. § 2254(b)(1)(A).

Exhaustion of state remedies requires that a petitioner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365 (1995) (internal quotation marks and citation omitted; alteration in original). The state courts must have had "the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding" for there to have been exhaustion of state remedies, and therefore a state prisoner must "present the state courts with the same claim he urges upon the federal courts." Picard v. Connor, 404 U.S. 270, 276 (1971). "Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). In New York, a defendant must exhaust his claims by seeking leave to appeal to the New York Court of Appeals. See Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir. 2000).

B.   State Procedural Requirements

A federal court "may not review federal claims that were procedurally defaulted in state court—that is, claims that the

state court denied based on an adequate and independent state procedural rule." Davila v. Davis, -- U.S. --, 137 S. Ct. 2058, 2064 (2017); see also Jimenez v. Walker, 458 F.3d 130, 136 (2d Cir. 2006) ("federal courts may not review the judgment of a state court that 'rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision'" (quoting Harris v. Reed, 489 U.S. 255, 260 (1989))). This principle serves to "ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." Martinez v. Ryan, 566 U.S. 1, 9 (2012).

A procedural rule is adequate if it is "firmly established and regularly followed by the state in question." Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999) (internal quotation marks and citation omitted). To be independent, the "state court must actually have relied on the procedural bar as an independent basis for its disposition of the case" by "'clearly and expressly' stat[ing] that its judgment rests on a state procedural bar." Harris, 489 U.S. at 261-63, 265 n.12. Further, a state court's reliance on an independent and adequate procedural bar forecloses habeas review even if the state court also rejected the claim on the merits in the alternative. See, e.g., id., at 264 n.10 (explaining that "a state court need not fear reaching the merits of a federal claim in an alternative holding" where it "explicitly

invokes a state procedural bar rule as a separate basis for [its] decision" (emphasis in original)); Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 810 n.4 (2d Cir. 2000) ("where a state court says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved"); Nowakowski, 2018 WL 6421056, at *6 (noting that "[t]he bar applies even where the state court has also ruled in the alternative on the merits of the federal claim" (internal quotation marks and citation omitted)).

Notwithstanding the existence of a procedural bar to a claim under state rules, "a federal court may still review the claim on the merits [1] if the petitioner can demonstrate both cause for the default and resulting prejudice, or [2] if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice." Petronio v. Walsh, 736 F. Supp. 2d 640, 654 (E.D.N.Y. 2010) (citing Coleman v. Thompson, 501 U.S. 722, 749-50 (1991)). As to the cause and resulting prejudice avenue, "[c]ause may be demonstrated with "a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that 'some interference by state officials' made compliance impracticable, . . . [or that] the procedural default is the result of ineffective assistance of counsel." Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994) (quoting Murray v. Carrier,

477 U.S. 478, 488 (1986) (citations omitted)).[7]  As to prejudice,

a petitioner must demonstrate more than "a _possibility_ of

prejudice," but rather that the errors below "worked to his _actual_

and substantial disadvantage."  _Murray_, 477 U.S. at 494 (internal

quotation marks and citation omitted; emphasis in original).

"The miscarriage of justice exception is concerned with

actual as compared to legal innocence."  _Calderon v. Thompson_, 523

U.S. 538, 559 (1998) (internal quotation marks and citation

omitted).  A petitioner must demonstrate, by clear and convincing

evidence, that he is actually innocent, and must support his claims

"with new reliable evidence – whether it be exculpatory scientific

evidence, trustworthy eyewitness accounts, or critical physical

evidence – that was not presented at trial."  _Schlup v. Delo_, 513

U.S. 298, 324 (1995).  Ormejuste does not argue that he is actually

innocent, nor does the record support any such argument, and

therefore the miscarriage of justice exception is inapplicable.

Accordingly, any analysis of whether Petitioner has overcome a

---

[7]  Although ineffective assistance of counsel may, in some
circumstances, constitute cause for a default, the claim for
ineffective assistance "generally must 'be presented to the state
courts as an independent claim before it may be used to establish
cause for a procedural default.'"  _Edwards v. Carpenter_, 529 U.S.
446, 452 (2000) (quoting _Murray_, 477 U.S. at 489); _see also_ _Pitre_
_v. Griffin_, No. 16-CV-6258, 2016 WL 7442653, at *11 (E.D.N.Y. Dec.
26, 2016) ("the ineffective assistance claim must itself have been
exhausted in the state court").  No such claim has been raised by
this Petitioner, either in the state courts or in this Petition.

procedural bar will be limited to the exception for cause and resulting prejudice.

Finally, "[t]he Court is mindful that, as with all <u>pro se</u> pleadings, a habeas petition filed <u>pro se</u> is to be construed liberally." <u>Crowder v. Ercole</u>, No. 09-CV-3401, 2012 WL 5386042, at *2 (E.D.N.Y. Nov. 2, 2012) (citation omitted); <u>see also</u> <u>Alonge v. Chappius</u>, No. 12-CV-542, 2019 WL 1642449, at *6 (E.D.N.Y. Apr. 16, 2019)("[T]he court must interpret petitioner's pleadings as raising the strongest arguments they suggest").

<u>DISCUSSION</u>

I.   <u>The Entry Claim</u>

Petitioner's Entry Claim asserts a violation of the Fourth Amendment, contending that: the "wellness check" or emergency doctrine exception was inappropriately applied; the warrantless entry into the Residence was illegal; and, the evidence seized therein should have been suppressed. The Supreme Court has held that a petitioner who has had a full and fair opportunity to litigate such a claim in state court may not seek federal habeas corpus relief: "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." <u>Stone</u>, 428 U.S. at 494. Implementing the <u>Stone</u> doctrine, the Second Circuit has determined

25

that review of a Fourth Amendment claim presented by a state habeas petitioner is only available in two instances: (1) "[i]f the state provides no corrective procedures at all to redress Fourth Amendment violations" or (2) where such a process is provided, "but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process." Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977). "The basic inquiry is whether the state prisoner was given the opportunity for full and fair litigation of his Fourth Amendment claim." Id.

It is well-established that New York provides a corrective procedure for challenging Fourth Amendment violations, which is, on its face, adequate. See Capellan v. Riley, 975 F.2d 67, 70 n.1 (2d Cir. 1992) ("federal courts have approved New York's procedure for litigating Fourth Amendment claims" (internal quotation marks and citation omitted)); see also Hogue v. Superintendent of Green Haven Corr. Facility, No. 20-CV-1720, 2020 WL 4260995, at *8 (E.D.N.Y. July 24, 2020) (noting that since New York provides an adequate corrective procedure for Fourth Amendment claims, "courts within this Circuit have almost uniformly held that challenges to a state court's rulings as to the application of the exclusionary rule are not reviewable under Stone"). Therefore, before this Court may examine his request for habeas relief on this claim, Petitioner must demonstrate that he

was actually prevented from using the corrective procedure by an "unconscionable breakdown" in the process.

Petitioner does not argue that he was precluded from using the corrective procedures below; indeed, he could not make such an argument because he did, in fact, fully litigate his Fourth Amendment claim. Petitioner: (1) had a pretrial Suppression Hearing at which five witnesses testified and were subject to cross-examination; (2) appealed the denial of his omnibus suppression motion, i.e., the Suppression Decision, to the Appellate Division, which affirmed the trial court's ruling on the merits; and, (3) sought leave to further appeal to the New York Court of Appeals on this issue. See, e.g., Singh v. Miller, 104 F. App'x 770, 772 (2d Cir. 2004) (finding no unconscionable breakdown occurred where petitioner raised his Fourth Amendment claims at a suppression hearing and on appeal); Hicks v. Bellnier, 43 F. Supp. 3d 214, 231 (E.D.N.Y. 2014) ("Petitioner would be hard-pressed" to establish an unconscionable breakdown where "the trial court held an evidentiary hearing, allowed Petitioner to present a case in support of his motion, and issued a reasoned ruling that there was reasonable suspicion to stop Petitioner and that the resulting evidence would be admissible at trial").

Further, a review of the record reveals nothing suggesting that there was any breakdown in the underlying procedures, much less one that was unconscionable. See generally

Cappiello v. Hoke, 698 F. Supp. 1042, 1050 (E.D.N.Y. 1988) (stating "an unconscionable breakdown in the state's process must be one that calls into serious question whether a conviction is obtained pursuant to those fundamental notions of due process that are at the heart of a civilized society"), aff'd, 852 F.2d 59 (2d Cir. 1988). In his Petition, Ormejuste makes no argument urging avoidance of the bar imposed by Stone, but rather essentially asks this Court to review the merits of the state court rulings against him. His failure to prevail below does not change the fact that he was afforded the requisite safeguards, and the "mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." Capellan, 975 F.2d at 72. Accordingly, federal habeas review of Ormejuste's Entry Claim is precluded under the Stone doctrine, and this claim must be dismissed. See Woods v. Kuhlmann, 677 F. Supp. 1302, 1306 (S.D.N.Y. 1988) (Stone "forbids de novo review of state court fact-finding on a Fourth Amendment issue particularly where, as here, the petitioner can claim only that the issue was wrongly decided").

II. The Remaining Claims

Petitioner's three Remaining Claims are identical to those raised on appeal. The State argues that these claims were not exhausted in the state courts and, alternatively, that they are procedurally barred.

A.   Exhaustion

The State argues that only the Entry Claim was exhausted in state court because the Remaining Claims were not presented to the New York Court of Appeals.  In a letter dated May 16, 2014 and addressed to the Clerk of the Court at the New York Court of Appeals, appellate counsel submitted copies of the briefs submitted to the Appellate Division, and that court's decision and order.  (See May 16, 2014 Appellant Letter, Ex. 3, ECF No. 8-1 at 118, attached to Resp. Opp.)   Beyond listing the enclosed documents, the letter did not address any arguments, stating simply that "I am seeking leave to appeal to the Court of Appeals and am requesting that you inform me of the name of the Judge to whom this matter will be assigned." (Id.)  A few weeks later, appellate counsel wrote a letter to Judge Read, which counsel characterized "as an additional argument on my client's request for leave to appeal" that was "meant to supplement the argument in appellant's brief in the Appellate Division." (May 30, 2014 Appellant Letter, Ex. 3, ECF No. 8-1 at 119, attached to Resp. Opp.) The supplemental letter addressed only the Entry Claim (see id. at 119-122), specifically whether the emergency doctrine was properly applied, and concluded that "leave should be granted to the appellant in this matter to rectify the illegal procedures utilized by the police and for purposes of guiding the lower courts in their determination of searches based on claims of 'wellness check'

and/or the emergency doctrine." (Id. at 122.) It did not reference any of the Remaining Claims. The State argues that providing the Appellant Brief was, by itself, insufficient to raise the claim before the Court of Appeals and concludes that the "fair import" of the letter supplementing only one claim is "that the other three claims had been abandoned." (Resp. Opp. at 40.)

To consider a claim exhausted in state court, it must be clear that the claim was properly presented to the highest court, here the New York Court of Appeals. In one case involving both initial and supplemental letters submitted to the Court of Appeals, the Second Circuit concluded that the state court was not presented an opportunity to rule on claims that were included in the Appellate Brief, but not addressed in a subsequent letter application. See Grey v. Hoke, 933 F.2d 117 (2d Cir. 1991). In Grey, the Circuit Court concluded that

> [t]he fair import of petitioner's submission
> to the Court of Appeals, consisting of his
> brief to the Appellate Division that raised
> three claims and a letter to the Court of
> Appeals arguing only one of them, was that the
> other two had been abandoned. The only
> possible indication that the other two claims
> were being pressed was the inclusion of a
> lengthy brief originally submitted to another
> court. This did not fairly apprise the court
> of the two claims. We decline to presume that
> the New York Court of Appeals has a duty to
> look for a needle in a paper haystack.

Id. at 120 (internal quotation marks and citation omitted). In a later case in which the appellant's initial letter contained

language expressly asking the Court to consider all the issues raised in the appellate brief, the Second Circuit distinguished Grey, finding "[t]hat statement was sufficiently specific to alert the Court of Appeals that [defendant] sought review of all of the issues raised in his pro se supplemental Appellate Division brief." Morgan, 204 F.3d at 370. The Second Circuit noted further that it is not appropriate "to infer that the New York Court of Appeals would construe counsel's second letter as eliminating issues as to which review had been expressly requested." Id. at 371.

This case is analogous to that presented in Grey. Ormejuste's Appellate Brief was submitted as an attachment to the initial letter, which only generally sought "leave to appeal" without identifying specific arguments. Moreover, the supplemental letter addressed only the Entry Claim without referring to any other claim. Thus, as in Grey, because (1) the initial letter provided the Appellate Brief without identifying the claims Ormejuste sought to appeal, and (2) the supplemental letter addressed only one claim, the Court of Appeals was not properly apprised that Ormejuste sought leave to appeal all the claims in the Appellate Brief. Accordingly, the Remaining Claims were not exhausted in state court.

Further, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." Harris,

489 U.S. at 263 n.9.  Here, since Petitioner has already sought leave to appeal to the New York Court of Appeals, he is procedurally barred from presenting the Remaining Claims to that court.  See Grey, 933 F.2d at 120.  Additionally, as the claims are based on matters that could have been raised on direct appeal, collateral review is also barred.  See N.Y. CRIM. PROC. LAW §§ 440.10(2)(a)&(c).  See Batts v. Artuz, 254 F. App'x 855, 856 (2d Cir. 2007) (holding, where a petitioner has failed to identify claims for the New York Court of Appeals in his request for leave to appeal, vis-à-vis his § 2254 petition, that petitioner "has both exhausted his state remedies for the purposes of federal habeas review and procedurally defaulted on those claims he failed to identify for the New York Court of Appeals").[8]

Even assuming, arguendo, that the Remaining Claims were properly presented to the New York Court of Appeals for review, those claims are subject to a further procedural bar in light of the Appellate Division's decision denying the appeal.

B.  Procedural Bar to Review

Finding the Remaining Claims unpreserved at trial, the Appellate Division denied each of them based on a state procedural

---

[8]  For this Court to consider the Remaining Claims despite the procedural bar, Petitioner must demonstrate cause for the default and prejudice resulting therefrom.  Ormejuste's failure to meet this requirement is discussed infra, Section III.B.2.

rule, and alternatively, found them to be without merit.  See Oremjuste, 117 A.D.3d at 756 (finding: as to the Statements Claim that "the specific arguments asserted by the defendant on appeal to support [the contention that the statements to law enforcement officers should have been suppressed] are unpreserved for appellate review"[9] and, "[i]n any event, the defendant's contention is without merit"; as to the Summation Claim, that the challenge to the prosecutor's remarks during summation "is unpreserved for appellate review, as the defendant did not object to any of those remarks" and, alternatively, that "[i]n any event, the contested remarks were responsive to arguments and theories presented in the defense's summation, . . . were permissible rhetorical comment, . . . or constituted harmless error"; and, as to the Hearsay Claim, the last claim that his "remaining contention is unpreserved for appellate review and, in any event, without merit").

---

[9]  The Appellate Division's reference to the "specific arguments asserted by the defendant on appeal" reflects that court's recognition that the arguments raised on appeal regarding the suppression of statements were different from the arguments raised before, and decided by, the trial court.  For example, where Petitioner argued previously that upon his transfer to Police Headquarters, a new, second session of questioning occurred and thus Miranda warnings should have been repeated, his new argument on appeal, and in this Petition, is that the totality of circumstances leads to the conclusion that the interview sessions at both locations constituted a single chain of events.

Pursuant to New York's "contemporary objection rule," the state's appellate courts "will review only those errors of law that are presented at a time and in a manner that reasonably prompted a judge to correct them during criminal proceedings." Downs v. Lapel, 657 F.3d 97, 103 (2d Cir. 2011); see also N.Y. CRIM. PROC. LAW § 470.05(2). The Second Circuit has "held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule," Downs, 657 F.3d at 104, that is "sufficient to invoke the 'independent and adequate state law ground' bar" to federal habeas review. Nowakowski, 2018 WL 6421056, at *6 (quoting Richardson v. Greene, 497 F.3d 212, 217-18 (2d Cir. 2007)); see also Kozlowski v. Hulihan, 511 F. App'x 21, 25 (2d Cir. 2013) ("[T]he contemporaneous objection rule provides an independent state-law ground for barring federal habeas review."); Forino v. Lee, No. 10-CV-5980, 2016 WL 7350583, at *10 (E.D.N.Y. Dec. 19, 2016) ("It is well-settled that New York's contemporaneous objection rule is an adequate and independent ground that bars federal habeas review").

It is further clear that any reference by the appellate court to an alternative, merits-based determination does not lift the procedural bar to review of these claims here. See generally Fama, 235 F.3d at 810 n.4 (reiterating that there is no basis for federal review of a claim where the state court determined that the claim "[wa]s 'not preserved for appellate review' and then

ruled 'in any event' on the merits"). Finally, the Appellate
Division found that the "remaining contention" was also
unpreserved and without merit. Where an appellate court refers
generally to "remaining contentions," the ruling encompasses any
claim presented to the court but not directly addressed in its
decision. See, e.g., Maddox v. Clinton Corr. Facility, No. 13-
CV-4268, 2016 WL 7388646, at *4 & n.2 (S.D.N.Y. Nov. 23, 2016)
(finding claim procedurally barred since Appellate Division's
reference to "remaining contentions" raised but not addressed
directly "certainly included this claim"), adopted by 2016 WL
7378973 (S.D.N.Y. Dec. 20, 2016); Ellis v. Miller, No. 97-CV-7049,
1998 WL 812664, at *5 n.5 (E.D.N.Y. Aug. 3, 1998) (finding claim
procedurally barred where the Appellate Division did not address
a claim directly "and therefore it was included among petitioner's
'remaining' claims that were not preserved for appellate review").
Thus, as the Hearsay Claim was presented and briefed on the appeal,
but not directly addressed, the remaining contention language
decided that claim, finding it unpreserved, and, in any event,
without merit.

The Appellate Division's decision rested on an
independent and adequate state ground, and therefore, the
Remaining Claims are procedurally barred from federal habeas
review. Because "the Appellate Division properly relied on a
procedural bar, petitioner would have to show that grounds exist

for reaching the merits notwithstanding that procedural bar." Ortiz v. Bradt, No. 13-CV-5420, 2013 WL 5775695, at *2 (E.D.N.Y. Oct. 25, 2013). To overcome this bar, the Petitioner must demonstrate cause for the default and prejudice. He has not attempted to show, nor has he raised any argument that could be liberally construed to establish, cause for the default or prejudice. See, e.g., Bellezza v. Fischer, No. 01-CV-1445, 2003 WL 21854749, at *18 (E.D.N.Y. Aug. 6, 2003) ("Because the required showing of cause and prejudice has not been made with respect to [petitioner]'s procedurally defaulted . . . claim, that claim should be dismissed without reaching the merits."); see also id. at *10 (stating that, while "a district court must consider a pro se litigant's habeas corpus petition with some liberality, the petitioner still bears the burden of proof" throughout the habeas proceeding (internal citation omitted)).

Ormejuste's Petition: attaches his Appellate Brief and application for leave to appeal to the New York Court of Appeals; restates the same four bases for relief that he raised on appeal; and, states, in relevant part, that he is entitled to relief "for all the reasons set forth" in those materials. (Petition, ¶ 15.) Rather than presenting his Petition as one for habeas relief under § 2254, essentially, Ormejuste treats his Petition instead as a further appeal. Notably missing from his pro se Petition is any argument addressing the cause for Ormejuste's default or any

resulting prejudice to him. In contrast, the State's Opposition specifically recites the legal hurdles necessary to overcome the procedural bar, which, it asserts, Petitioner is unable to meet. (See Resp. Opp. at Point II.) Although he was afforded the opportunity to reply to the State's opposition, Ormejuste has failed to do so; in sum, Petitioner has not carried his burden of demonstrating cause for his failure to raise these claims below. Moreover, the Court's review of the record finds nothing that would support either basis for lifting the procedural bar.

Upon the habeas record presented, Petition has completely failed to present any cause for the default, much less identify any resulting prejudice; nor will the Court speculate to find that such circumstances existed. Hence, the Remaining Claims are dismissed as procedurally defaulted.

## CONCLUSION

Accordingly, for all the foregoing reasons, IT IS HEREBY ORDERED that the Petition for a writ of habeas corpus (ECF No. 1), is DENIED. Thus, the Clerk of the Court is directed to: dismiss the Petition; close the case; and, mail a copy of this Order to Petitioner.

Further, the Court:

(A) Declines to issue a certificate of appealability because the Petitioner has not "made a substantial showing of the

denial of a constitutional right," 28 U.S.C. § 2253(c)(2); and

(B)   Pursuant to 28 U.S.C. § 1915(a)(3), certifies that any appeal from this Order would not be taken in good faith, and, therefore, in forma pauperis status is denied for the purpose of any appeal.  See Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     June  23  , 2021
           Central Islip, New York